# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| JON JASON KING,<br><br>        Plaintiff,<br>  v.<br><br>CITY OF RICHLAND et al.,<br>        Defendants. | Case No. CV-13-5130-JPH<br><br>ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |

**BEFORE THE COURT** is defendants' motion for summary judgment filed February 12, 2015. ECF No. 42. Plaintiff has not filed a response. Twice the Court granted Plaintiff's motions for additional time in which to file a response. ECF No. 57, 60. Defendants replied. ECF No. 56, 64. The matter was noted for hearing without argument on May 26, 2015. ECF No. 60. The parties consented to proceed before a magistrate judge. ECF No. 28. The Court is fully informed and prepared to decide the pending motion in advance of the scheduled hearing date.

Plaintiff (King) is a prisoner currently in custody at the Coyote Ridge

Order~ 1

Corrections Center in Connell, Washington proceeding *pro se*. ECF No. 61. His complaint pursuant to 42 U.S.C. § 1983 alleges defendants deprived him of his rights protected by the Fourth, Eighth and Fourteenth Amendments by using excessive force during his arrest in March 2013. ECF No. 11 at 2-4.

### I.  Summary judgment standards

Defendants move for summary judgment. ECF No. 42.

Summary judgment is appropriate when it is demonstrated that there exists no genuine dispute as to any material fact, and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). Under summary judgment practice, the moving party

[A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" *Id.* A complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. *Id*. In such a circumstance, summary judgment should be

granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56 (c) [now 56(a)], is satisfied." *Id*.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, *Wool v. Tandem Computers, Inc*., 818 F.2d 1433, 1436 (9th Cir. 1987).

The evidence of the opposing party is to be believed, *Anderson,* 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party, *Matsushita*, 475 U.S. at 587 (citing *United States v. Diebold, Inc*., 369 U.S. 654, 655 (1962)(per curiam)). Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985),

*aff'd*, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine dispute, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

**II. Issues**

Defendants' motion raises three issues: (1) are defendants' entitled to qualified immunity (2) did the officers' conduct violate King's constitutional rights and (3) is the City of Richland liable? Although Plaintiff failed to file a response and the Court could summarily grant summary judgment, *see* Local Rule 7.1(d)(failure to comply with the requirements of LR 7.1(b) may be deemed consent to the entry of an Order adverse to the party who violates these rules), the Court elects to address the issues.

**III. Overview**

Briefly, after King was arrested, Officer Parish warned King he would use force if King did not comply with commands to place his feet inside of the patrol car. When King did not comply Parrish "delivered several quick knee strikes to Mr. King's [right] quadriceps muscles" as he resisted attempts to get him into the patrol car. Officer Crouch delivered several quick foot strikes to the "common peroneal nerve in Mr. King's right leg." Both officers allege they used no more force than

was necessary to gain King's compliance. ECF No. 42 at pp. 10-11, citing Defendants' statement of fact numbers 18, 23-29; ECF No. 42 at p. 13, citing defendants' statement of fact number 37.

**IV.  Facts**

On March 27, 2013, the events giving rise to this action took place. King was released from jail in Kennewick, Washington. [King deposition 30:1-12 .] He walked to his girlfriend's house and drank some alcohol. [King dep. 30:13-16.] His girlfriend came home and told him to leave because he had been drinking. [King dep. 30:18-21.] King left and began looking for a place to "sober up and chill out" before a party later that evening. [King dep. 30:21, 32:11-13.]

Later the same day several officers from the Richland Police Department (RPD) responded to a citizen's report of suspicious circumstances inside a neighboring residence. [Crouch declaration ¶¶ 6, 7; Parish decl. ¶¶ 6, 7.] RPD officers detained King as he left the residence. [Crouch decl. ¶¶ 8, 9; Parish decl. ¶ 8; King dep. 36:2-6.]

According to the officer defendants, King refused to comply with their verbal commands and physically resisted being taken into custody. [Crouch decl. and Parish decl. ¶¶ 9.] RPD officers were eventually able to gain control of King, and he was placed in handcuffs by Officer Parish. [Parish decl ¶ 9.] Parish informed King he was being detained for questioning in a residential burglary. [Parish decl. ¶ 10.]

Parish and another RPD officer walked King to Parish's patrol car. [Parish decl. 10.] King was "verbally uncooperative" during this process and showed poor balance. [Parish decl. ¶ 10, 11.]

When they arrived at the patrol car, Parish asked King if he had any weapons on him and performed a search. [Parish decl. ¶ 11.] During this process, King was verbally uncooperative and tried to pull away from Parish and out of his grasp. [Parish decl. ¶ ¶ 11, 12.]

King "had to be controlled by other RPD officers" in order for Parish to complete the weapons search. [Parish decl. ¶12.] During this process, Officer Crouch grabbed King's hand and "bent it away from his body," causing pressure on his wrists against the handcuffs. [Crouch decl. ¶ 12.] This is a common pain compliance technique Crouch learned at police academies and as part of his RPD training. [Crouch decl. ¶ 12, Lee decl. ¶ 14.] Using this technique, King complied and Crouch reduced the pressure on King's wrists. [Crouch decl. ¶ 12.]

King's speech was slow, slurred and repetitive, and his eyes were bloodshot. [Parish decl. ¶ 11.] Parish smelled intoxicants on King's breath. [Parish decl. ¶ 11.] These observations, in addition to King's poor balance, led Parish to conclude King was likely intoxicated. [Parish decl. ¶ 11.]

According to King, he had been drinking that evening because he was mad at his girlfriend. [King dep. 36: 2-13, 66: 14-19.] King is unable to remember critical

facts about that evening, including how he arrived at the residence where he was detained by the police, because of his alcohol consumption.  [King dep. 36: 12-22, 66: 14-19.]

After Parish finished the weapon search, he tried to place King in his patrol car. [Parish decl ¶ 13.]  King repeatedly refused Parish's commands to voluntarily place himself completely inside the car. [Parish decl. ¶ 13.]  Parish warned King that if he continued to refuse to obey, force would be used to get him inside the car. [Parish decl. ¶ 13.]  King continued arguing and refused to obey Parish's commands, "so Officer Parish pressed his fingertips into Mr. King's brachial plexus clavicle notch nerve point." [Parish decl. ¶ 13.] This is a common pain compliance technique Parish learned at the academies and at the RPD.  [Parish decl ¶ 13, Lee decl. ¶ 13.]  Upon applying this technique, King sat all the way inside the patrol car and Parish immediately stopped the pressure. [Parish decl.  ¶ 13.]

However, once King was seated in the car,  he refused to put his legs and feet inside the car. [Parish decl. ¶ 13.] Parish had to physically place King's legs inside the car to shut the door. [Parish decl. ¶ 13.] Parish read King *Miranda* warnings. [Parish decl. ¶ 14.] When other officers finished searching the burglarized house, Parish and another officer took King out of the car  to further search him for items missing from the house. [Parish decl. ¶ 15.] Officers noticed the unusual tread on King's shoes appeared to match tread prints taken from a previous burglary scene.

Order~ 7

They decided to take the shoes as evidence of the prior burglary. [Crouch decl. ¶ 15; Parish decl. ¶¶ 16, 17.]

After his shoes were taken King became very upset and even more uncooperative. He refused to heed commands to sit back down inside the patrol car and put his feet inside. [Crouch decl. ¶¶ 16, 17; Parish decl. ¶¶ 18, 19.] Parish once again applied fingertip pressure to King's brachial plexus notch nerve to get him to sit down. When King sat down Parish released the pressure. [Parish decl. ¶ 19.]

Again King refused to put his legs and feet inside the car. As Parish tried to put King's legs inside he began resisting. King refused to obey repeated commands to put his legs inside the car. [Crouch decl. ¶ ¶ 18  ; Parish decl. ¶ 20.] Several times Parish put King's legs inside the car and King threw his legs back out of the car, preventing Parish from closing the car door. [Crouch decl. ¶ 19; Parish decl. ¶ 21.]

King's refusal to allow Parish to close the door created a safety concern that King may attack the officers or try to flee. [Crouch decl. ¶ 20; Parish decl. ¶ 22; Lee decl. ¶ 18.]

Parish warned King that he would use his knee to strike King's leg if he continued refusing to put his legs inside the car. King failed to heed the warnings and Parish struck King's right quadriceps muscle with his knee. [Crouch decl. ¶ 21; Parish decl. ¶ 23.]

A knee strike is another commonly used pain compliance technique taught at

Order~ 8

academies and at the RPD. This does not cause lasting damage but, at most, causes temporary discomfort, temporary motor dysfunction and possibly short term bruising. [Crouch decl. ¶ 21; Parish decl. ¶ 23; Lee decl. ¶¶ 13, 19.]

After the knee strike, King continued refusing to put his legs inside the car. Again Parish warned he would use another knee strike if King did not comply. King did not. Parish gave King several more quick knee strikes; after each one Parish checked for compliance and, when King continued putting his leg outside the car before the door could be shut, Parish delivered a knee strike. [Crouch decl. ¶ 22; Parish decl. ¶ 24.]

Since Parish was unable get King to comply Crouch said he would try to get King to put his legs inside the car. [Crouch decl. ¶ 23; Parish decl. ¶ 25.] Crouch pushed King toward the center of the car so he would be unable to keep his feet and legs outside the car. [Crouch decl. ¶ 24.] They then tried to shut the door but King put his foot outside before they could do so. [Crouch decl. ¶ 24; Parish decl. ¶ 25.]

To try to get King to pull his legs and feet back into the car, Crouch kicked King's right common peroneal nerve several times quickly. This type of kick or "strike" is another commonly used pain compliance technique Crouch learned at academies and at the RPD. [Crouch decl ¶ 25; Lee decl. ¶ 12, 24-25.]

This type of strike is delivered to the large muscles running down the side of a person's leg causing nerve stimulation and temporary muscle impairment. It is not

Order~ 9

1 intended to and typically does not cause lasting damage. It does cause temporary
2 discomfort and muscle impairment. {Lee decl. ¶ 25.] King finally pulled his feet
3 inside the car. The officers shut the door. [Crouch decl. ¶ 25; Parish decl. ¶ 26.] As
4 they finished the investigation and prepared to take King to jail he said that his leg
5 hurt. [Crouch decl. ¶ 27; Parish decl. ¶ 8.] They took him to Kadlec Regional
6 Medical Center in Richland where he was examined by a doctor in the emergency
7 room and x-rays of his right leg were taken. These were normal. The ER doctor
8 cleared King for jail transport. [Crouch decl. ¶ 27; Parish decl. ¶ 28; King dep. at
9 52:3-8, 56: 4-16.]

10 Crouch took King to the Benton County Jail for booking. Parish had no
11 further contact with King. After Crouch took King to booking he had no further
12 contact with King. [Crouch decl. ¶ 28; Parish decl. ¶ 29.]

13 Unsurprisingly King has no police or defensive tactics training. [King dep. at
14 73: 9-12.] He has no knowledge of the RPD's training, policy or procedure. He does
15 not know how the city supervises its police officers. To King's knowledge, officers
16 do not have policy-making authority. [King dep. at 71: 21-24, 73:17-23, 76: 19-25,
17 77: 1-20.].

18 King's claims against the city of Richland are based solely on the fact the
19 officers were city employees on the date of King's arrest. [King dep. at 75: 22-25,
20 76: 12.] The officers' use of force complied with RPD's policies and procedures and

was consistent with their training over the years. [Crouch decl. ¶ 30; Parish decl. ¶ 30; Lee decl. ¶¶ 13, 27-28.] The officers used no more force than necessary to gain compliance and the type of force used was appropriate under the law on March 27, 2013. [Lee decl. ¶¶ 13, 28.]

**V. 1983 claims**

In order to recover damages under 42 U.S.C § 1983, King must prove by a preponderance of the evidence that the defendants deprived him of a constitutional right while acting under color of state law. *Tatum v. City and County of San Francisco*, 441 F.3d 1090, 1094 (9th Cir. 2006), citing *Gritchen v. Collier*, 254 F.3d 807, 812 (9th Cir. 2001). It is undisputed here that the officers were acting under color of state law. Summary judgment is inappropriate if a reasonable jury could find by a preponderance of the evidence that a plaintiff was entitled to a favorable verdict. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 251-52 (1986).

**VI. Qualified immunity**

King alleges defendants violated 42 U.S.C. § 1983 by violating the Fourth, Eight and Fourteenth Amendments' protection against excessive force. Defendants respond, in part, that they are entitled to qualified immunity from King's 1983 claims. ECF No. 42 at 14-15. In the absence of any genuine issues of material fact, defendants are entitled to qualified immunity.

" 'Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct.' " *Hunt v. County of Orange*, 672 F.3d 606 (9th Cir. 2012)(internal citation omitted). "A government official's conduct violates clearly established law when, at the time of the challenged conduct, 'the contours of a right are sufficiently clear' that a 'reasonable official would have understood that what he is doing violates that right.' " *Anderson*, 483 U.S. at 640. We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. Al-Kidd*, 563 U.S. __, 131 S. Ct. 2074 (2011).

Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The objective of the qualified immunity doctrine is to insure "that 'insubstantial claims' against government officials be resolved prior to discovery and on summary judgment if possible." *Anderson v. Creighton*, 483 U.S. 635, 640 n. 23 (1987), citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818-19 (1982). Meeting this objective requires that immunity questions be resolved "at the earliest possible stage in litigation." *Hunter*

Order~ 12

*v. Bryant*, 502 U.S. 224, 227 (1991)(per curiam).

If a court decides that plaintiff's allegations do not make out a statutory or constitutional violation, "there is no necessity for further inquiries concerning qualified immunity." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Likewise, if a court determines that the right at issue was not clearly established at the time of the defendant's alleged misconduct, the court may end further inquiries concerning qualified immunity without determining whether the allegations in fact make out a statutory or constitutional violation. *Pearson,* 555 U.S. at 236-42.

A claim that officers used excessive force to effectuate a seizure is governed by the Fourth Amendment's reasonableness standard. *Plumhoff v. Rickard*, __U.S. __, 134 S. Ct. 2012 (2014).

### A. Eighth and Fourteenth Amendment rights

Defendants allege they are entitled to summary judgment on King's Eighth and Fourteenth Amendment claims because they are not cognizable. ECF No. 42 at 6-8. Defendants are correct.

*Eighth Amendment.* The Eighth Amendment's protection from cruel and unusual punishment does not attach until after conviction and sentencing. *Graham v. Connors*, 490 U.S. 386, 392 n. 6 (1989); *Pierce v. Multnomah County*, 76 F.3d 1032, 1042 (9th Cir. 1996). After conviction, the Eighth Amendment "serves as the primary source of substantive protection ... in cases ... where the deliberate use of force is

challenged as excessive and unjustified." *Graham*, 490 U.S. at , n. 10, citing *Whitley v. Albers*, 475 U.S. 312, 327 (1986). It is undisputed that the conduct here took place in the context of an arrest, not post-conviction.

*Fourteenth Amendment.* The Due Process Clause protects prisoners from deprivation of life, liberty or property without due process of law. As defendants correctly point out, the Supreme Court has held that claims an officer used excessive force during a seizure, including an arrest, should be analyzed under the Fourth rather than the Fourteenth Amendment. *Graham v. Connors*, 490 U.S. at 395.

Accordingly, summary judgment is granted on defendants' motion with respect to Plaintiff's claims under the Eighth and Fourteenth Amendments.

### B. Fourth Amendment rights and qualified immunity

King alleges he was unconstitutionally deprived of his Fourth Amendment rights as a result of the officers' use of excessive force during his arrest. Citing *Graham*, 490 U.S. at 395, defendants respond that the use of excessive force is a cognizable claim under the Fourth Amendment, but they allege their use of force was reasonable rather than excessive, and they assert they are entitled to qualified immunity. ECF No. 42 at 9-15.

The defendants are entitled to qualified immunity.

The right to make an arrest or investigatory stop necessarily carries with it "the right to use some degree of physical coercion or threat thereof to effect it."

*Graham v. Connors*, 490 U.S. 386, 396 (1989). Determining whether the force used is reasonable for Fourth Amendment purposes requires carefully "balancing the nature and quality of the intrusion on the individual's Fourth Amendment interest against the countervailing governmental interest at stake." *Id*. Assessing the severity of the intrusion on Fourth Amendment rights requires the evaluation of the type and amount of force used. *Bryan v. McPherson*, 630 F.3d 805, 824 (9th Cir. 2010), citing *Chew v. Gates*, 27 F.3d 1432, 1440 (9th Cir. 1994). The relevant factors to consider when weighing the governmental interests include the severity of the crime, whether the suspect poses an immediate threat to the safety of officers or others and whether the suspect is actively resisting arrest. *Graham*, 490 U.S. at 396; *Chew v. Gates,* 27 F.3d at 1440.

The reasonableness of the force used is viewed objectively "from the perspective of the a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396-97.

The use of force against King was objectively reasonable and therefore constitutional. The officers did intrude upon King's Fourth Amendment rights. *See Graham*, 490 U.S. at 396. Here, however, the government's interest outweighs the gravity of the intrusion on King's Fourth Amendment rights. *See id.* The severity of the crime, residential burglary, favors the government. King had refused to comply with the officers' orders. The officers reasonably and objectively feared for their

safety, King's safety and that of passersby created by his continued refusal to put his legs inside the patrol car so they could shut the door. Until he complied with their orders they also reasonably and objectively feared he would try to escape. The final *Graham* factor also weighs in the government's favor, as King actively and physically resisted arrest. *See e.g., Blankenhorn v. City of Orange*, 485 F.3d 463, 469 (9th Cir. 2007) (neither tackling nor punching a suspect is necessarily excessive); *Goldsmith v. Snohomish County*, 558 F.Supp.2d 1140, 1150 (W.D. Wash. 2008)(applying *Graham* analysis). The court has found pain compliance techniques involve a "less significant" intrusion upon an individual's personal security than most claims of force. *Bryan v. MacPherson*, 630 F.3d 805, 820 (9th Cir. 2010), citing *Brooks v. City of Seattle*, 599 F.3d 1018, 1027-28 (9th Cir. 2010), *overruled by Mattos v. Agarano*, 661 F.3d 433 (9th Cir. 2011) (en banc)(reversing denial of qualified immunity). The officers' use of force was objectively reasonable and constitutional. The officers are entitled to qualified immunity at *Saucier's* first step. *See Jackson v. City of Bremerton*, 268 F.3d 646, 653 (9th Cir. 2001); *Saucier v. Katz*, 533 U.S. 194, 201-05 (2001).

Alternatively, the right to be free from commonly used pain compliance techniques was not clearly established at the time of King's arrest. *See Ashcroft v. al-Kidd,* 563 U.S.\_\_, 131 S. Ct. 2074, 2083 (2011)(internal citation omitted) (official's conduct violates clearly established law when the contours of a right are

Order~ 16

sufficiently clear that every reasonable official would have understood that their conduct violated that right); *Tatum v. City and County of San Francisco*, 441 F.3d 1090, 1097 (9th Cir. 2006)(summary judgment granted, finding use of control hold objectively reasonable where suspect was potentially violent, behaved erratically and resisted arrest). Under the second prong of the *Saucier* test defendants are also entitled to qualified immunity. *Saucier v. Katz*, 533 U.S. at 201-05.

**VII. City not a party**

The court previously granted King's motion to add the city of Richland as a defendant. ECF No. 29. However, thereafter King failed to do so. Defendants pointed this out in their summary judgment motion. ECF No. 42 at 15-17. King failed to file a response. Accordingly, the city of Richland is not a named defendant in this case.

After review, **IT IS ORDERED** Defendant's Motion for Summary Judgment, ECF No. 42, is **GRANTED** and the complaint is dismissed with prejudice.

The District Court Executive is directed to enter this Order, enter judgment for Defendants, forward copies to the parties and close the file.

**DATED** this 7th day of May, 2015.

*S/ James P. Hutton*

JAMES P. HUTTON

UNITED STATES MAGISTRATE JUDGE